## STATE OF NEVADA ex. rel. GEORGE A. NOURSE, v. ROBERT M. CLARKE.

A person holding the office of United States District Attorney, on the day of election, is incapable of being chosen to the office of Attorney General of the State.

Section 9 of Article IV of the Constitution of Nevada, which declares "that no person holding any lucrative office under the Government of the United States, or any other power, shall be eligible to any civil office of profit under this State," is not confined to members of the Legislature, but is applicable to all officers of State.

A person holding a civil office under the United States, can resign such office without the consent of the appointing power, or the acceptance by it of such resignation. It is not in the power of the Executive to compel any civil officer to remain in office.

THIS is an original proceeding in the nature of a *quo warranto* in this Court.

*George A. Nourse in pro per.*

*R. S. Mesick*, for the Defendant.

State of Nevada ex rel. Nourse *v.* Clarke.

Opinion by BEATTY, C. J., BROSNAN, J., concurring.

Proceeding in the nature of a *quo warranto*.

The relator, George A. Nourse, was elected Attorney General of the State of Nevada, in 1864, and entered on the duties of that office the fifth of December the same year.

At the November election, 1866, the defendant received the largest number of votes for the same office ; soon after received his certificate of election and commission, and on the seventh of January, 1867, (the day fixed by law for the commencement of a new term of that office) having previously qualified, he entered on the performance of the duties of the office, since which time he has continued in the office.

On the eigthteenth day of January, A.D. 1867, the present relator filed his complaint or information, setting up substantially that defendant was not eligible to the office of Attorney General when he received the votes for that office ; that by reason of such ineligibility on the part of defendant there was no person elected to that office, and that relator was entitled to hold over until the next general election. To sustain his case, he showed that Clarke, prior to the November election, 1866, had been United States District Attorney for the State of Nevada.

Defendant showed that on the twenty-fifth of October, 1866, he wrote a conditional resignation of his office of District Attorney. This resignation was to take effect on the first of January, 1867, or on the appointment of his successor. There is no positive proof that his resignation was ever forwarded to the President, but the circumstantial evidence tending to show that the President received it prior to the twenty-seventh day of November, 1866, is very strong. On the fifth day of November, 1866, one day prior to the election, the defendant wrote a peremptory resignation to take effect *immediately*. This was mailed the day it was written and sent by the next mail, which left this place the night of the fifth, or very early on the morning of the sixth.

In determining the rights of the parties under this proceeding, we are first called on to interpret and construe several clauses of the Constitution of Nevada. Section 9, Article IV, of the Constitution is in these words :

" No person holding any lucrative office under the Government of the United States, or any other Power, shall be eligible to any civil office of profit under this State; provided, that postmasters, whose compensation does not exceed five hundred dollars per annum, or commissioners of deeds, shall not be deemed as holding a lucrative office."

The language of this section is certainly comprehensive enough to include within its scope the office of Attorney General; but the defendant contends that other sections, by their context, show that this provision is not applicable to that office. He contends that this section being contained in that article which relates to the legislative department, refers only to such offices as are in some way connected with the legislative branch of the government.

This view it is claimed is strengthened by the fact that the twelfth section of Article V provides that " no person shall, while holding an office under the United States Government, hold the office of Governor, except as herein expressly provided." If the Section 9 in Article IV applies to all officers, why repeat this prohibition in Section 12 of Article V?

Again, Section 19 of Article V reads as follows : " A Secretary of State, a Treasurer, a Controller, a Surveyor General and an Attorney General shall be elected at the same time and places, and in the same manner as the Governor. The term of office of each shall be the same as is prescribed for the Governor. Any elector shall be eligible to either of said offices." Here the qualifications necessary to make a party eligible to the office of Attorney General are stated, and it is contended that this section negatives the idea of there being any other qualification required.

The mere fact that Section 12 of Article V repeats a prohibition against the Governor of the State holding that office whilst he holds one under the General Government, we think is not entitled to much weight. The different articles of the Constitution are generally under the superintendence of distinct committees.

The attention of each committtee is called particularly to the article immediately under its supervision.

The draft of the whole instrument from necessity is not in the hands of one person or of one committee. Hence, there is a lia-

bility to unnecessay repetitions.   We think it clear that the ninth
Section of Article IV was not intended to be confined in its effect
to officers connected with the legislative department of the Govern-
ment.

The last sentence in Section 19 of Article V, in speaking of
certain officers, including the Attorney General, says: " Any elec-
tor shall be eligible to either of said offices."   This sentence
seems as plainly to dispense with any qualification for this office
other than those pertaining to any elector, as Section 9 of Article
IV imposes the disqualification arising from holding a Federal
office.   In language, there is a complete contradiction between the
two sections.   Usually, where there is one section in a statute or
Constitution, general in its terms, and another section special and
limited, but in direct conflict with the general provisions, the latter
should be construed as an exception to the general law.   And if
we were to look only to Sections 9 of Article IV and 19 of Article
V, we would be bound to come to the conclusion that the first
mentioned section established a general rule applicable to all offices,
and the latter an exception to that rule in favor of the five offices
therein mentioned.   But examining Section 19 in connection with
other portions of Article V, we are led to the conclusion that this
section was not intended to make an exception to the general rule
laid down in Section 9 of the preceding article.

Section 3 of Article V provides that a party, to be eligible to
the office of Governor, shall possess certain qualifications as to age
and length of residence, beyond those required for a mere elector.

Section 17 of same article requires the same qualifications to
make a party eligible to the office of Lieutenant Governor as are
required for Governor.   Section 19, in regard to Attorney General
and other officers, concludes by declaring that " any elector shall
be eligible to those offices."   This taken in connection with the
preceding sections, we think shows that the connection intended by
the latter sentence to express the qualification as to age and resid
ence which would be required in such officers, and not to exempt
them from the operation of Section 9 of Article IV.   Whilst we
are satisfied that in coming to this conclusion we have arrived at
the true intent of the Convention, we have doubted whether we

37

have not violated some important rules of construction. Rules on this subject are necessarily conflicting. We can only endeavor, guided by the circumstances surrounding each case and those rules which have been established by the wisdom and experience of Judges for past ages, to arrive at the intention of the law-making power, when the language used can by any fair construction be made to express such intention.

Admitting, then, that Section 9 of Article IV applies to the office of Attorney General, we are next called on to interpret the word " eligible" as used in this section.

The relator contends that the plain `and unmistakable meaning of the word is " capable of being elected or chosen."

The defendant on the other hand contends that, as used in this section, it means not " capable of being chosen," but " capable of holding." " If," says defendant, " this is a mere prohibition against being elected to a State office whilst holding a Federal office, then a party might be elected to a State office first, receive a Federal appointment to a lucrative office afterwards, and hold both offices at the same time." This would be in violation of the spirit of the instrument. We agree with the defendant that the framers of the Constitution intended to prohibit one who was holding a lucrative Federal office from holding a State office at the same time. But instead of restricting the meaning of the word " eligible," as defendant contends, we think, to carry out the intention of the Constitutional Convention, we ought rather to give it a more extended signification than is generally given, and hold that it means both " incapable of being legally chosen" and " incapable of legally holding."

The etymology of the word and the meaning generally given to it by the best English authors would hardly justify this interpretation. But the word, as used in various State Constitutions, seems to justify this broader and more comprehensive interpretation. In nearly if not quite all the State Constitutions, the principle seems to have been adopted of prohibiting those who were holding lucrative Federal offices from holding at the same time the more important State offices.

Sometimes the most appropriate language has not been used to

express this prohibition. The word " eligible" in many of the Constitutions as in ours, seems to have been used in a very comprehensive sense. If then, as we have concluded, one holding the office of United States District Attorney on the day of election is incapable of being lawfully chosen to the office of Attorney General of the State of Nevada, the next point of inquiry is : Was the defendant United States District Attorney on the sixth day of November, 1866 ?

This we think depends on this question : Can a person holding a civil office under the United States Government resign the same at will without any regard to the will or convenience of the appointing power ? Upon this subject there appears to be no statutory or written law. We find no English authorities, and but few decisions in the United States.

We have one citation (from 4 Dev. Reports) to the effect that, as offices are held at the will of both parties, an officer must retain his position until his resignation is accepted. As we have not the report itself, but a mere citation in Bouvier's Law Dictionary, we are not able to determine what weight should be given to the decision. It may be founded upon some State law, which would render it inapplicable in this case.

In the case of the *United States* v. *John C. Wright,* upon a bond given as surety for the faithful performance of duty by one Fogg, a revenue officer, one of the defenses interposed by Wright was substantially to the effect that Fogg, for whom he was surety, resigned his office on the second of August, 1817, and that he had committed no default prior to that time. In the United States District Court, where the case was first tried, it was found that Fogg, on the twenty-fifth of July, 1817, had written a letter of resignation. The resignation, however, was by the terms of the letter to take effect when a successor should be appointed. That letter was received on the second of August by the Commissioner of Revenue. The Commissioner requested Fogg to hold on for a time, and he continued to exercise his office for several months thereafter.

The District Judge before whom the case was tried instructed the jury that Fogg had resigned his office on the second of August, and his sureties were not bound for his acts after that time. The

United States took the case by writ of error before the Circuit Court, and the only point discussed seems to have been whether the charge of the District Judge was erroneous ; the defendant contending : First, that the charge was correct; second, that if not technically correct, it did the plaintiff no harm.   The first point, then, for the Court to determine was, whether the charge was correct. This necessarily involved the question, when did the resignation of Fogg take place ; or rather the question, did that resignation take place on or before the second of August ?   If so, the plaintiff had no cause of complaint.

The Court, in considering this question, came to the conclusion that the resignation did not take effect on the second of August, for the reason that it was not a peremptory resignation, but a conditional one in its terms.   But whilst they arrived at this conclusion, they took occasion to express themselves in regard to the right of resignation, in the following terms : " There can be no doubt that a civil officer has the right to resign his office at pleasure, and it is not in the power of the Executive to compel him to remain in office. It is only necessary that the resignation should be received to take effect ; and this does not depend upon the acceptance or rejection of the resignation by the President.   And if Fogg had resigned absolutely and unconditionally, I should have no doubt that the defendant could not be held bound subsequently as his surety."

But relator contends this is a mere dictum, and therefore entitled to but little weight.   *Dictum* is defined to be an opinion expressed by a Judge on a point not *necessarily* arising in a case.   Perhaps this may be called a mere *dictum ;* for after determining that the resignation was not absolute, and for that reason did not take effect on the second of August, it was not essential to say that it would have taken effect on that day if it had been absolute.   But whilst we may say that this was technically a mere *dictum*, it certainly is not liable on the main point (to wit, the absolute right of resignation) to the objections usually urged against the binding force of *dicta*.

The reason assigned for their not being entitled to weight is that usually they are upon some point not discussed at bar—something to which the attention of the Court has not been particularly called

—and something on which the Judge uttering them may not have reflected a moment before expressing his opinion.

Here one of the principal points of discussion must have been : Has a civil officer the absolute right of resignation, without regard to the acceptance or nonacceptance thereof ?    The Court, after listening to that discussion, says in effect : " We have no doubt at all that he has such right, but we think this officer did not exercise that right ; his resignation was not absolute but conditional."    A decision given under these circumstances, after full discussion, we think entitled to far more weight than an ordinary *dictum* upon a point not discussed, and not connected—except in some remote and incidental manner—with the case decided.

The Supreme Court of California, in the case of *People* v. *Porter*, 6 Cal. 28, adopt that part of the decision in 1st McLean's Reports, which holds " that there can be no doubt that a civil officer has the right to resign his office at pleasure, and it is not in the power of the Executive to compel him to remain in office."

The relator objects to this authority on the ground that resignations of County Judges in California were at that time regulated by statute.    That whilst there is no doubt of the correctness of the rule adopted in Porter's case on the subject of resignations, yet the reason of that ruling is to be found in the statute, and not in common law principles.    There is certainly some force in the argument of relator that the California statute affords strong ground for such a rule, independent of common law principles.    But the report of the case of the *People* v. *Porter* does not show that the counsel for plaintiff took any such grounds ; they seemed to rely on common law principles alone to maintain this point.    The Court sustained them without any reference to the statute whatsoever.    So far as the authority is concerned, the weight thereof seems to be in favor of the proposition that a civil officer has the absolute right of resignation at pleasure.    As a matter of reason and policy we think that the better rule.    Where there is no law compelling the acceptance of office, we see no reason for compelling the retention thereof after acceptance.

Whilst there are generally many applicants for all offices that are lucrative, there are other offices to which are attached neither salary

nor perquisites, or if any, so small an amount as not to be sought after by any person. If a party accepting such office did not have the unconditional privilege of resigning at will, the best citizens would be deterred from accepting.

Guided then by the best lights before us, we must conclude that a civil officer has the absolute right of resignation at will. If this be the case, when did the defendant resign? Not on the twenty-fifth of October, because that was a conditional resignation. But he did resign on the fifth of November. That day he placed his resignation in the post office; by the following morning it was mailed and beyond his reach. At the same time he gave notice to the District Judge of his resignation, and his intention no longer to exercise the functions of the office, and from that day ceased to act as such.

Now, if defendant had an absolute right to resign at any time, it seems to us he exercised that right on the fifth of November. He wrote his resignation to take effect *immediately*, and he did an act which we consider equivalent to a delivery of that resignation to the proper officer. He mailed it and placed it beyond his power to recall. From the time the letter started in the mail the writer had no control over it. When it arrived at Washington, it belonged to the President and not to the writer. He could not reclaim the letter. He might, it is true, have telegraphed his withdrawal of the resignation. But this, in our opinion, would have effected nothing. According to our view, the moment the letter went beyond his reach a vacancy occurred in the office, and no telegram he could send would fill that vacancy. That could only be done by a new appointment. When a resignation is sent to take effect at a certain day the case is different. Then there is no vacancy in the office until that day arrives, and if in the meantime the resignation is withdrawn, the party stands as if he had never written or sent his resignation.

In arriving at the conclusion that defendant's resignation took effect on the fifth of November, we have not overlooked the fact that we run counter to a part of the opinion in the case reported in 1 McLean.

But that portion of the opinion is a pure *dictum* upon a point

State of Nevada ex rel. Nourse *v.* Clarke.

which could not well have been the subject of discussion or mature consideration. The defendant set up the defense that Fogg had resigned on the second of August, and defendant was not thereafter bound. This defense was equally available if the resignation took effect on the twenty-fifth of July. For if Fogg was not an officer after the twenty-fifth of July, he certainly was not after August 2d. The defendant then took the strongest position for him, that the sending and receipt at the proper office of the resignation made a vacancy in the office.

The Court holding under these circumstances that the sending and receipt of the resignation did effect a vacancy in the office, scarcely amounts to a *dictum* to the effect that the sending of it alone would not have produced the same result.

We do not know in this case (perhaps the Circuit Court did not know) how the resignation was sent. If sent by the private agent of the officer resigning, undoubtedly it should not have been treated as delivered by the officer until it reached its destination. In contemplation of law in such case, the resignation was in his own hands and under his own control. Not so where it is placed in the public mails. So too where there is a resignation in the ordinary form, not designating when it is to take effect, it might well be held that such resignations are not intended to take effect until received by the appointing power. But where there is no ambiguity, but an absolute resignation to take effect *immediately*, to hold that the officer remains in office after placing such a paper in the post office is simply to hold that he has not an unqualified power of resignation. If he must remain in office until his resignation is received, the officer to receive it might in many ways retard or prevent the reception of the resignation, and thus compel a party to remain in office against his will.

Having disposed of the case on this point, we do not think it necessary to determine what the relator's rights would have been in case we had determined the defendant was not eligible. The proceeding is dismissed at the cost of the relator, and the clerk will so enter the judgment.